## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **COVENTRY HEALTH CARE OF NEBRASKA, INC., d/b/a AETNA BETTER HEALTH OF NEBRASKA,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**NEBRASKA DEPARTMENT OF ADMINISTRATIVE SERVICES, et al.,**<br><br>    **Defendants.** | **Case No. 4:16-CV-3094** |
| **AMERIHEALTH NEBRASKA, INC. d/b/a ARBOR HEALTH PLAN,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**NEBRASKA DEPARTMENT OF ADMINISTRATIVE SERVICES, et al.,**<br><br>    **Defendants.** | **Case No. 4:16-CV-3100** |

## STATE DEFENDANTS' CONSOLIDATED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 4

LEGAL STANDARD ........................................................................................ 8

RESPONSE TO PLAINTIFFS' STATEMENTS OF FACT ....................................... 9

   A. Inaccuracies in Aetna's Statement of Facts ........................................... 10

   B. Response to Arbor's Statement of Facts ............................................... 16

ARGUMENT .................................................................................................. 16

    I. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION ................................................................................... 16

      A. The public's interest in the stability and continuity of Medicaid delivery in Nebraska would be severely harmed by the issuance of a preliminary injunction ...................................................................................... 16

        1. Nebraska Medicaid and the need for Heritage Health ............... 17

        2. Potential detrimental effects of delay on Heritage Health implementation ............................................................................. 18

        3. Potential detrimental effects of delay on continuity of delivery of behavioral health services .............................................. 20

      B. Neither Aetna nor Arbor will suffer irreparable harm in the absence of a preliminary injunction ........................................................... 24

        1. Alleged irreparable harm based on Aetna and Arbor's interests as taxpayers ........................................................................... 25

        2. Aetna's alleged irreparable harm based on its interests in the bidding process ........................................................................ 29

        3. Aetna's misappropriation of the interests of Medicaid beneficiaries and others .................................................................... 34

C.   Neither Plaintiff is likely to succeed on its claims ................................... 36

1. Claims arising under federal law ...................................................... 36
a. Plaintiffs' due process claims are unlikely to succeed because failed bidders do not hold a property interest in the award of a public contract ............... 36
b. Claims under 45 C.F.R. § 75.326 ............................ 39
i. Failure to allege differentiated procurement policies ............................................................. 40
ii. No private right of action .............................. 41

2. Claims arising under Nebraska law ................................................. 46
a. Claims under the Nebraska APA ............................. 47
i. Absence of a rule or regulation .................... 47
ii. Failure to challenge a rule or regulation ....... 47
iii. Even if the DAS procurement manual constituted a rule or regulation, Plaintiffs have not challenged its validity .............................. 51
iv. Substantively, no provision of the DAS procurement manual was violated ................ 52
b. Claims under Nebraska Declaratory Judgments Act ............................................................................. 57
i. Sovereign immunity ........................................ 57

D.   Plaintiffs' pecuniary and commercial interests are vastly outweighed by the harm Medicaid-dependent Nebraska families would suffer if the State's delivery of Medicaid services was disrupted by a preliminary injunction ................................................................................................ 62

II.    PLAINTIFFS MUST GIVE ADEQUATE SECURITY IF PRELIMINARY INJUNCTION IS ISSUED ............................................... 63

CONCLUSION ............................................................................................... 64

CERTIFICATE OF SERVICE .................................................................... 66

Defendants Nebraska Department of Administrative Services ("DAS"), Nebraska Department of Health and Human Services ("DHHS"), Attorney General Doug Peterson (defendant in Case No. 4:16-cv-3094 only), DAS Director Byron Diamond, DHHS CEO Courtney Phillips, DHHS Medicaid and Long-Term Care Director Calder Lynch, and DAS Acting Materiel Division Administrator Frances "Bo" Botelho (collectively "State Defendants") submit this consolidated brief in opposition to the motions for preliminary injunction in the above-captioned cases.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nebraska has embarked on the creation of Heritage Health, a comprehensive endeavor to integrate and significantly improve the provision of Medicaid services to eligible citizens through Managed Care Organizations ("MCOs"). This strategic effort

---

[1] For the sake of efficiency and for the Court's ease in review (and in anticipation that these cases will likely be consolidated or, at minimum, considered together for purposes of the preliminary injunction motions), State Defendants are submitting this consolidated brief identically in both cases. The comparatively minor distinctions in State Defendants' arguments will be noted herein.

Plaintiff Coventry Health Care of Nebraska, Inc., d/b/a Aetna Better Health of Nebraska, whose motion for preliminary injunction is at Case No. 4:16-cv-3094, Filing 21, will be referred to herein as "Aetna." Aetna's brief at Filing 22 on that docket will hereinafter be referred to as "Aetna Br." References to evidence and other materials on the Aetna docket will use the shorthand: "Aetna Filing ##."

Plaintiff AmeriHealth Nebraska, Inc., d/b/a Arbor Health Plan, whose motion for preliminary injunction is at Case No. 4:16-cv-3100, Filing 21, will be referred to herein as "Arbor." Arbor's brief at Filing 22 on that docket will hereinafter be referred to as "Arbor Br." References to evidence and other materials on the Arbor docket will use the shorthand: "Arbor Filing ##."

will unify the delivery of physical health, behavioral health, and pharmacy services systems, all of which are now separately administered through disparate programs. It will improve health outcomes and create a more efficient means of providing Medicaid throughout Nebraska.

To initiate Heritage Health, DAS, on behalf of DHHS, issued a request for proposal ("RFP 5151 Z1" or the "RFP") indicating that the State would award at least two and up to three contracts for Nebraska's full-risk capitated Medicaid managed care program for physical health, behavioral health, and pharmacy services. The contracts awarded are to become effective January 1, 2017, and will extend for at least five years.

Plaintiffs' dissatisfaction lies in the failure of their respective bids to score among the top three selected for contract awards. More specifically, they allege that a limited rescoring of the corporate overview section of the bidders' proposals was improper, violated Nebraska procurement law, and violated Plaintiffs' federal constitutional rights. As described herein, these contentions are facially without merit.

Though it could perhaps be expected that Plaintiffs—having failed to obtain Heritage Health contracts and the substantial revenue attendant to such contracts— would seek judicial review of the bidding process, the disruptive preliminary injunctive relief they seek must not be permitted. For beyond Plaintiffs' failure to show their claims are likely to succeed and that they would suffer *irreparable* harm in the absence of a preliminary injunction, such an injunction bears the potential to massively harm the continuity of the State's ability to deliver Medicaid services to its neediest residents.

This is due in large part to the context in which Plaintiffs ask this Court to shut down the State's implementation of Heritage Health. This change is not from a static status quo that could be maintained indefinitely while Plaintiffs enjoy the comfort (and revenue) of a preliminary injunction and engage in a protracted second-guessing of the Heritage Health bidding. Rather, this carefully planned and time-sensitive transition comes as other contracts for Medicaid delivery reach or draw near their end. In other words, and as described at length below, the delay created by a preliminary injunction could interrupt the delivery of critical Medicaid services.

Plaintiffs have no answer to these massive public interest concerns, instead devoting much of their respective arguments to vague (and dubiously supportable) notions that their proffered irreparable harm can be presumed and "established as a matter of law." This is insufficient for the extraordinary relief Plaintiffs seek.

This brief will address each prong of the Eighth Circuit's *Dataphase* test for preliminary injunctions. State Defendants will first address the foregoing public interest issue, given its weight in this particular case. State Defendants will then address irreparable harm, noting that because Plaintiffs' alleged harms are essentially *commercial* in nature, they have failed to show they will suffer *irreparable* harm in the absence of a preliminary injunction.

State Defendants will address Plaintiffs' federal and state law arguments separately and demonstrate that neither Plaintiff has shown a likelihood of success on its claims. Plaintiffs' federal due process claims, brought under 42 U.S.C. § 1983, fail

given the absence of a cognizable protected property interest. Their preemption claims likewise fail given that Plaintiffs, as losing bidders for Medicaid administration contracts, lack a right of action under the Medicaid regulatory provision they invoke.

Plaintiffs' claims under Nebraska law are similarly unlikely to succeed. To the extent such claims are brought under the Nebraska Administrative Procedure Act ("APA"), they must fail due to Plaintiffs' failure to challenge a "rule" or "regulation" (or the validity of the same) and since, substantively, no provisions of the manual guiding agency procurement were violated. To the extent Plaintiffs' claims are brought under the Nebraska Declaratory Judgments Act, such claims are barred by sovereign immunity. Likewise and alternatively, Plaintiffs are not entitled to declaratory relief since no provision of Nebraska law was violated.

Some of the claims brought by Aetna, in particular, are frivolous bordering on vexatious. To wit, Aetna includes as a named Defendant Attorney General Peterson, yet Aetna's complaint is utterly devoid of mention of any involvement in the Heritage Health bidding process by either the Attorney General or his office. Nor does any of the evidence submitted by Aetna reflect the Attorney General's involvement. Further, Aetna's brief is silent on how relief against the Attorney General, whose name appears to have been tossed into Aetna's pleadings on a whim, is necessary for any of Aetna's varied federal or Nebraska law claims.

This brief will close near where it began, balancing the commercial harms faced by the Plaintiffs in the absence of a preliminary injunction against the harm such a

disruption would cause to the State's ability to deliver critical Medicaid services to some of its most dependent citizens. For the same reasons articulated in State Defendants' public interest argument, these latter harms vastly outweigh any pecuniary injuries alleged by Plaintiffs.

## LEGAL STANDARD

"[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Home Instead, Inc. v. Florance,* 721 F.3d 494, 500 (8th Cir. 2013) (Riley, C.J., dissenting) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed. Cir. 1993)). The burden of establishing the propriety of an injunction is on the movant. *Roudachevski v. All-American Care Centers, Inc.,* 648 F.3d 701, 705 (8th Cir. 2011).

When evaluating whether to issue a preliminary injunction, a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

The burden on a movant to demonstrate that an injunction is warranted is heavier when granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits. *Rathmann Grp. v. Tanenbaum,* 889 F.2d 787, 790 (8th Cir. 1989).

Cases involving disputes over government procurement contracts almost invariably emphasize that the courts should be extremely reticent to interfere with government procurement policies, given the complexity of procurement decisions, the lack of expertise possessed by the courts, the discretion invested in the procurement officer, and the potential confusion, inefficiency, delay, and increased expense that can result. *C.S. McCrossan Const., Inc. v. Minnesota Dept. of Transp.,* 946 F. Supp. 2d 851 (D. Minn. 2013); *Onan Corp. v. United States*, 476 F. Supp. 428, 433 (D. Minn. 1979); *accord, e.g., Smith & Wesson, Div. of Bangor Punta Corp. v. United States,* 782 F.2d 1074, 1081–82 (1st Cir. 1986) (noting the "strong public interest in an orderly, efficient, expeditious government procurement process"; "It would be intolerable for any frustrated bidder to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign.") (internal quotations and citation omitted).

## RESPONSE TO PLAINTIFFS' STATEMENTS OF FACT

Generally, Plaintiffs' respective statements of fact fairly reflect the sequence of events which led to this litigation, specifically with regard to the issuance of the RFP, the initial bidding process, the rescoring process, and final awards. *See, generally,* Aetna Br. 4-24; Arbor Br. 2-6. Embedded within Aetna's statement (and, indeed, even within Aetna's basically accurate chronology), however, lie arguments and gross distortions of fact which the Court must reject. To that end, this response is limited to addressing a

selection of the most egregious of these factual mischaracterizations. It is not comprehensive and deliberately does not restate the entirety of the underlying history.

## A. Inaccuracies in Aetna's Statement of Facts.

### 1. *Claimed lack of experience, training, or education by the rescore evaluators.*

Aetna devotes great energy to the notion that two of the rescore evaluators (Jerry Broz and Mary Stahly) "had no experience, training, or education regarding Medicaid policies or Medicaid managed care…" and that these evaluators were not "subject matter experts" equipped to handle the rescoring. Aetna Br. 16, 34-35. At best, Aetna misapprehends the relation of these evaluators' expertise to the nature of their discrete and limited rescoring assignment. Alternatively, Aetna understands this relation perfectly and instead seeks to distract the Court with irrelevant allegations, obliquely disparaging Broz and Stahly's qualifications along the way. Regardless, the issue of Broz and Stahly's qualifications is, on its face, a red herring worthy of the Court's outright rejection.

As Aetna concedes, the rescoring was limited to the Corporate Overview (Part 1) component of the RFP. Aetna Br. 15-16. *It did not include the Technical Approach (Part 2) components, which substantively concern the actual administration of Medicaid delivery. See* Exhibit 3, Declaration of Francis "Bo" Botelho ("Botelho Dec.") ¶ 13 (testimony of the acting DAS Material Division Administrator confirming the non-Medicaid nature of the Corporate Overview part); Aetna Filing 23-13 (DAS Notice indicating the limited re-evaluation of the Corporate Overview section, *only*); Aetna Filings 23-10 and 23-27

(score sheets reflecting the differentiated and divisible scoring approach taken to Parts 1 and 2); *see also* RFP at 196-198, available at: http://bit.ly/29VI4QS (the RFP itself clearly reflects the distinction between the Corporate Overview part and its general, non-project-specific subparts and the Technical Approach part, which deals with the Medicaid-specific terms of the RFP).[2]

Most importantly, Broz and Stahly were both well-suited to this task. Exhibit 4, Declaration of Jerry Broz ("Broz Dec.") ¶¶ 10-12 and attached resume (Broz, a CPA, had forty years of private sector accounting, auditing, management, tax and finance responsibilities and specific experience in evaluating business practices); Exhibit 5, Declaration of Mary Stahly ("Stahly Dec.") ¶¶ 10-12 and attached resume (Stahly, who holds an MBA, was experienced in evaluating business records and particularly experienced with grant reviews in the non-profit sector, which are analogous to RFP evaluation processes). The DAS executives charged with managing the rescoring recognized this and confirmed that the rescore evaluators had appropriate business expertise and experience to evaluate the Corporate Overview part. Botelho Dec. ¶ 14; Exhibit 2, Declaration of Byron Diamond ("Diamond Dec.") ¶ 16(f).

For these reasons, any suggestion that either Broz or Stahly were unqualified to participate in the limited rescoring of the Corporate Overview part is utterly without merit.

---

[2] The cited pages of the RFP refer to incorporated attachments which supplement the RFP. These are available by further link at: http://bit.ly/29M6nVn.

### 2. *Claimed "chaotic" nature of rescoring process and "pressure" on rescore evaluators.*

Aetna variously claims that "evaluators were *pressured* to complete their evaluations quickly" in the midst of a "*chaotic*" rescoring process. Aetna Br. 17-18, 35, 37 (emphasis added). This gratuitous characterization lacks even inferential support in the very evidence submitted by Aetna.

The exhibits referenced in support of this baseless proposition include Filings 23-16 through 23-23. This cherry-picked selection of emails between and among DHHS and DAS officials and the rescore evaluators reflect the controlled planning and implementation of the limited rescoring of the Corporate Overview section by professionals. Though conducted on a necessarily abbreviated timetable, nothing in these emails even hints at the "chaos" imagined by Aetna.

More troubling, however, is Aetna's allegation that the rescore evaluators were "pressured" to rush their evaluations. Aetna points to the emails at Filings 23-21 through 23-23 for support. Two, Filings 23-21 and 23-23, simply reflect the agency manager's congratulations to the evaluators for their timely review. The third, Filing 23-22, is devoid of any pressure but, rather, is simply a check-in on the remaining evaluators to ensure they were "doing okay." Hardly the stuff of improper pressure or "cheered rushing."

Moreover, DAS officials have testified that the time allotted for the rescoring was, in their considered judgment, adequate given the substantive scope of the rescoring and the qualifications and experience of the evaluators. *See* Botelho Dec. ¶ 14; Diamond

Dec. ¶ 16(g). Likewise, Broz and Stahly have each testified that they were provided with adequate time to fairly and accurately evaluate the bids on an equal basis and to review such evaluations for consistency. Broz Dec. ¶¶ 8-9; Stahly Dec. ¶¶ 8-9. Broz and Stahly have further testified as to their belief that their evaluations would not have substantively differed even if they had been provided more time. *Id.*

The Court should accordingly note the gulf between the content of these materials and Aetna's claims of "chaos" and "pressure."

### 3. *Claimed improper communication to and among rescore evaluators.*

Along a similar vein, Aetna devotes significant argument to the dubious notion that the rescore evaluators improperly communicated with one another and other agency personnel "in direct violation of the [Agency Procurement Manual for Services ("Manual")] prohibition on such communications." Aetna Br. 18-19, 36-37. Again, this argument distorts the content of and finds no support in the cited materials.

As a threshold matter (and putting aside the issue of whether the Manual's terms are binding as a matter of law, as addressed elsewhere in this brief), Aetna simply misstates the terms of the Manual's communication prohibition. *See* Aetna Br. 18 (citing Aetna, Filing 23-5 at 29). The subpart on the cited page that appears to have caught Aetna's attention is 12(b), which reads in its entirety:

> Scoring should be done on an individual and independent basis. Proposals should be scored independently from each other. An evaluator should not compare one proposal against another. Evaluation and scoring is based upon the response to the RFP requirements. Evaluators should not

> discuss the scoring amongst themselves or with anyone else until after the
> score sheets have been turned in.

*See* Manual, Aetna Filing 23-5 at 29. This clearly bars comparisons of *scores* among evaluators and discussion of the same.

With the precise wording of that provision established, it is appropriate to turn to the emails Aetna cites as evidence that the scoring discussion prohibition was violated. *See* Aetna Filings 23-24 through 23-26. Not one supports this claim.

The email ostensibly revealing improper communications between the evaluators is a single email from Broz to Stahly wherein Broz provides the DHHS contact's cell phone number in case Stahly had any questions. Aetna Filing 23-24. The other two emails consist of the DHHS contact advising the rescore evaluators as to where in the bidders' proposals the evaluators could locate content relating to score sheet questions. Aetna Filings 23-25 and 23-26. Indeed, one of these, Aetna Filing 23-25, contains guidance for navigating the content of *Aetna's own proposal*, though Aetna notably makes no argument that the agency contact was misleading the evaluators to content which could prejudice Aetna's scoring.

Aetna has provided no evidence whatsoever of improper communications to, from, or among the rescore evaluators.

### 4. *Claimed "improper waiver" of offshoring requirements.*

Aetna devotes significant argument to the notion that State Defendants "improperly waiv[ed], for the benefit of one bidder only, the RFP's express prohibition

against 'offshoring…'" Aetna Br. 3, 41. The basis for this argument is the provision of the RFP that, "Payment for items or services provided under this contract may not be made to any entity located outside of the United States." RFP at 142, § IV(P)(1)(e), available at: http://bit.ly/29VI4QS. Aetna contends that Intervenor-Awardee Wellcare improperly included in its proposal that claims processing services would be subcontracted to "Concentrix" at a non-U.S. address. *See* Aetna Br. 41 (citing Aetna Filing 23-34 at ECF p. 4). Aetna, without evidence, contends this "waiver" amounted to favoritism by State Defendants and "places Nebraska residents' private health information at risk." *Id.*

Aetna's factual characterization is deeply flawed. First, though Wellcare's proposal suggests certain subcontracted administrative tasks may be handled outside the United States, nothing in it remotely suggests that *payment* will be made to a non-U.S. entity, which is what the RFP proscribes. Indeed, Aetna's theory forecloses the possibility that the subcontractor, Concentrix, is actually an American company based in Fremont, California, which indeed it is. Indeed, the *contact number* provided for the subcontractor is itself a U.S. number.

Moreover, though Aetna makes several citations to federal sources to shore up its notion that the Concentrix subcontract proposal is somehow improper, Aetna makes no argument that actual offshoring would even be illegal under federal Medicaid law. *See* Aetna Br. 41. Indeed, the Inspector General report cited by Aetna expressly confirms the legality of such arrangements. Office of Inspector General, Dept. of

Health and Human Services, OEI-09-12-00530, Memorandum Report: Offshore Outsourcing of Administrative Functions by State Medicaid Agencies 3 (Apr. 11, 2014), available at: http://bit.ly/2anLxev.

In sum, the Court should disregard Aetna's illegal offshoring allegations.

**B. Response to Arbor's Statement of Facts.**

State Defendants generally take no issue with the chronology set out in Arbor's Statement of Facts which, on its face, contains little of the inflammatory and inaccurate mischaracterizations described above. Arbor Br. 3-6.

## ARGUMENT

**I.  PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.**

**A. The public's interest in the stability and continuity of Medicaid delivery in Nebraska would be severely harmed by the issuance of a preliminary injunction.**

Though likelihood of success on the merits, as the first factor of the *Dataphase* test, is "often . . . considered . . . to be the most important one," *Roudachevski,* 648 F.3d at 706 (quoting *Kai v. Ross,* 366 F.3d 650, 653 (8th Cir. 2003)), this particular case warrants a threshold discussion of the detrimental effects a preliminary injunction would have on the public interest.

The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 910 (N.D. Iowa 2008). However,

there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers. *Id.*

The public interest factor is generally an elusive one in that opposing parties can often make reasonable arguments that the public interest favors each side of the dispute. *Clark Const. Co. v. Pena*, 895 F. Supp. 1483, 1493 (M.D. Ala. 1995). No such elusion exists here as both Aetna and Arbor are ill-equipped to argue that the disruption of Nebraska's Medicaid delivery systems remotely approaches serving the public interest.

### 1. Nebraska Medicaid and the need for Heritage Health.

Nebraska Medicaid provides health care for approximately 233,000 low-income, elderly, and disabled people, as well as pregnant women and infants and toddlers with special needs. Exhibit 1, Declaration of Calder Lynch ("Lynch Dec.") ¶ 6. Approximately $1.8 billion of federal and state tax monies is spent annually to provide this medical assistance. *Id.* Medical services provided by Nebraska Medicaid include intermediate care facilities for persons with developmental disabilities, inpatient hospitals, medicines, transportation to medical appointments, and additional services provided to elderly or disabled persons in their own homes. *Id.*

The three broad categories of Medicaid services—physical health benefits, behavioral health benefits, and pharmacy benefits—are currently delivered through three separate, fragmented systems to the vast majority of Nebraska Medicaid recipients. *Id.*

¶ 7. Physical health benefits, delivered through regional managed care plans, include inpatient and outpatient hospital care, emergency care, medical equipment such as hearing aids and prosthetics, and other primary care services. *Id.* ¶ 8. Behavioral health benefits, delivered through a single statewide managed care plan, include all mental health and substance use disorder services. *Id.* ¶ 9. Pharmacy benefits are provided to Medicaid recipients through a program operated directly by the DHHS Division of Medicaid and Long-Term Care ("MLTC"). *Id.* ¶ 10.

The disconnected nature of delivering physical health benefits, behavioral health benefits, and pharmacy benefits led Nebraska Medicaid toward implementing a more integrated, efficient delivery system. *Id.* ¶ 11. That system is titled Heritage Health,[3] an initiative that combines physical health benefits, behavioral health benefits, and pharmacy services into one integrated health care delivery system that will be administered statewide through contracts with managed care organizations (MCOs). *Id.* ¶¶ 11-12. Heritage Health will result in all-inclusive and consistent care coverage, enhanced health outcomes due to better communication among primary care providers and behavioral health providers, and reduced taxpayer costs because of increased preventive services and improved care coordination. *Id.*

### 2. Potential detrimental effects of delay on Heritage Health implementation.

---

[3] For purposes of this brief, any reference to "Heritage Health" refers to the prospective integration of physical health, behavioral health, and pharmacy services into a unified system, as set forth in the RFP underlying this litigation.

To meet Heritage Health's January 1, 2017, implementation date, Nebraska Medicaid and the three successful bidders (the Intervenors) are currently engaged in considerable and interconnected pre-implementation activities. *Id.* ¶ 14 (these include outreach to beneficiaries and providers, the monthly convening of advisory committees to address integration, administration, and quality management issues, and enrollment preparation). Of particular importance among the sequential steps required for implementation is the drafting of a State Plan Amendment and submission of the same to the Centers for Medicare and Medicaid Services ("CMS"), the federal agency charged with administering Medicaid nationally, for review and approval. *Id.* ¶ 15. Capitation rates for the winning MCOs must also be finalized and data and computer network updates must be developed and tested. *Id.*

Other actions dependent on the January 1, 2017, implementation date include Nebraska Medicaid's contract with Automated Health Systems to provide enrollment broker services beginning on September 1, 2016. *Id.* ¶ 16. Enrollment broker services include member choice counseling, health plan selection through web and phone enabled methods, auto-assignment of members who do not select a health plan, and outreach and education to community organizations that interact with Medicaid clients. *Id.* This contract works in tandem with Heritage Health, and its terms are based upon a January 1, 2017 implementation date for Heritage Health. *Id.*

Additionally, Nebraska Medicaid is in the process of seeking a qualified contractor to provide Medicaid data management and analytics services to the agency.

*Id.* ¶ 17. These services would allow MLTC to better manage recipient, provider, and claims data. *Id.* The pending RFP for this contract was drafted and issued under the assumption that Heritage Health would be implemented on January 1, 2017. *Id.*

Adequate implementation time is necessary to ensure a smooth transition to Heritage Health for Medicaid recipients and providers. *Id.* ¶ 17. The current schedule of pre-implementation activities allows for the implementation of Heritage Health on a measured, yet expeditious, basis. *Id.* If the pre-implementation activities were to be delayed by a court order, resuming them would not be as simple as "picking up where we left off" and merely pushing back the implementation schedule by the same amount of time as the delay. *Id.* Decisions already made, and steps already executed, would need to be reevaluated in light of the then-existing circumstances. *Id.* Needless to say, the disruption of this significant and intricately planned process would result in additional and duplicative expense, both in terms of time and taxpayer dollars. *Id.*

### 3. Potential detrimental effects of delay on continuity of delivery of behavioral health services.

The potential harm inflicted by Plaintiffs' requested delay would not only materialize in the effects on the State's implementation of a significantly improved and integrated Medicaid delivery system. Such a delay would present the very real possibility of damaging the continuity of the State's ability to deliver behavioral health services.

If the pre-implementation activities described above were to be temporarily halted due to a court order for *any* length of time, Heritage Health could not be

implemented by January 1, 2017. *Id.* ¶ 21. In light of the status of the State's contract with its current behavioral health MCO (Magellan), failure to implement Heritage Health on time could result in a significant disruption in behavioral health services provided to approximately 230,000 Nebraska Medicaid recipients. *Id.*

While the contracts between Nebraska Medicaid and the three MCOs currently providing physical health benefits expire on June 30, 2017, the behavioral health contract with Magellan expires on **August 31, 2016**. *Id.* ¶ 22. Negotiations with Magellan regarding an extension of the contract beyond August 31, 2016, are underway, but no agreement has yet been reached regarding a contract extension. *Id.* Magellan has indicated a willingness to extend the current contract to December 31, 2016, but has also expressed concerns about executing an extension beyond that date if such contract end date lacks definition. *Id.* ¶ 23. The delay posed by a preliminary injunction would complicate these negotiations by magnifying the difficulty of determining the extended contract's end date and increase the likelihood that Magellan would *not* agree to an extension beyond December 31, 2016. *Id.*

*If Heritage Health is delayed and if Magellan extends its current contract only to December 31, 2016, the prime option for providing behavioral health benefits to Medicaid recipients after January 1, 2017, would be to revert from a managed care delivery system to a fee-for-service delivery system operated in-house by DHHS.* Id. ¶ 24. **This is far beyond the capacity of the State to administer under such a timeline.** Id.

Providing behavioral health benefits under a fee-for-service system would require levels of staff, physical resources, and systems capacity Nebraska Medicaid simply does not possess. *Id.* ¶ 25. It lacks sufficient staff to process the thousands of additional claims that would be received, nor does it have sufficient clinical staff to review claims or grant prior authorizations. *Id.* The agency's computer system for handling claims would require the investment of significant time and resources to accommodate such a transition. *Id.*

Moreover, even if such capacity and infrastructure *could* be developed on such a timeline, DHHS lacks the authorized resources to construct it. Providing behavioral health benefits under a fee-for-service system would require levels of funding that the Nebraska Legislature has not appropriated. *Id.* ¶ 26. As a state executive branch agency, DHHS is limited to performing the activities for which the Legislature has appropriated funds. *Id.* Thus, without timely implementation of Heritage Health *or* an extension of the Magellan contract beyond December 31, 2016, there is no capability to provide behavioral health benefits to tens of thousands of Nebraska Medicaid recipients under a fee-for-service model. *Id.*

An emergency short-term contract for behavioral health services management is not a realistic solution. *Id.* ¶ 27. Pursuant to 42 CFR Part 438, these contracts must be reviewed and approved by the Centers for Medicare and Medicaid Services, which is under no time constraints in reaching a decision. *Id.* Thus, if a preliminary injunction

were entered, it increases the likelihood that no system for providing behavioral health benefits would be approved and in place by January 1, 2017. *Id.*

Without the staff, physical resources, systems capacity, or appropriations to administer behavioral health benefits, the State would be unable to scrutinize claims submitted by providers to detect fraud, waste, and abuse. *Id.* ¶ 28. It would likewise be unable to timely pay the claims submitted by providers. *Id.* Such a failure would violate federal law, which requires payment of claims to providers within certain time frames. *Id.* Such a failure would also impact thousands of behavioral health providers in Nebraska, who would be unable to rely on timely payment for their services, and the uncertainty introduced by that scenario into their business plans would jeopardize their continued provision of behavioral health services to Medicaid recipients. *Id.*

The greatest impact, however, would be felt by the tens of thousands of Nebraska Medicaid recipients who receive and need behavioral health services. *Id.* ¶ 29. Without a sound system of administering behavioral health benefits after January 1, 2017, many of the individuals currently receiving behavioral health benefits could suffer a disruption in services from their providers. *Id.* Recipients of Nebraska Medicaid behavioral health services include some of the most vulnerable individuals in the state. *Id.* Any disruption of services to these individuals would place them, and the public, at-risk of additional harm. *Id.*

Plaintiffs' respective arguments fail to account for these harms. Arbor's discussion of the public interest amounts to all of three paragraphs and is based entirely

on the vague notion that this analysis should begin and end on the taxpayers' interest in avoiding the illegal expenditure of public funds. Arbor. Br. 9-10 (Arbor separately makes a substantive argument on irreparable harm along similar lines; such argument is without merit, as addressed elsewhere in this brief.)

Aetna's discussion of the public interest is tucked at the fifty-third of its fifty-five page brief and is folded into its irreparable harm argument. Aetna Br. 53-54. Aetna correctly notes the public interest in ensuring adequate, uninterrupted care for Nebraska's most vulnerable citizens," but its brief is devoid of any explanation as to how the injunction it seeks would not result in just such an interruption. Aetna Br. 53. Aetna instead simply concludes, without support, that "a preliminary injunction would cause no disruption in service, no enrollment or re-enrollment by beneficiaries, no provider contracting (and re-contracting) between providers and the new MCOs." *Id.* This conclusory argument is overwhelmed by the disruptive effects of an injunction, as described above.

The Court should accordingly bear in mind where the public interest truly lies as it proceeds to the other *Dataphase* prongs. It is decidedly not in threatening the continuity of Medicaid services to the State's most dependent citizens.

### B. Neither Aetna nor Arbor will suffer irreparable harm in the absence of a preliminary injunction.

The injuries alleged by Aetna and Arbor—two losing bidders for shares of nearly a billion dollars in government service contracts to administer the State's Medicaid

programs—are self-evidently commercial in nature. They can be measured in dollars and thus are inherently not *irreparable*. This is fatal to their requests for preliminary relief.

"The absence of irreparable injury is by itself sufficient to defeat a motion for a preliminary injunction." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015) (internal quotation omitted). To succeed in demonstrating a threat of irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914-15 (8th Cir. 2015) (internal quotation omitted). "Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered." *Id.* at 915 (internal quotation omitted).

Under neither of the two theories of irreparable harm variously advanced by Plaintiffs has this standard been satisfied.

### 1. Alleged irreparable harm based on Aetna and Arbor's interests as taxpayers.

*Dataphase* requires Aetna and Arbor to show the threat of *irreparable* harm to *themselves*. Aetna attempts to do so by focusing on alleged harm to Medicaid beneficiaries and unidentified "third parties that conduct business in Nebraska." Aetna Br. 51. But, any hypothetical "confusion and anxiety in the enrollee population" or to unidentified

third parties conducting business is not irreparable harm to Aetna itself. *Id.* As an alternative, Aetna claims it faces a threat of irreparable harm as a state taxpayer. *Id.* at 47 (citing *Rath v. City of Sutton,* 673 N.W.2d 869 (Neb. 2004)). Arbor solely relies on its status as a state taxpayer to argue it faces irreparable harm. Arbor Br. 7 (citing *Rath*). Under Plaintiffs' theory, concerned state taxpayers watching the alleged illegal expenditure of public money, should be presumed by federal courts to be irreparably harmed. Both prongs Plaintiffs use to construct their theory have been rejected by the Supreme Court.

The first prong of Plaintiffs' irreparable harm theory hinges on this Court finding Plaintiffs have state taxpayer standing.[4] But taxpayer standing is limited in federal court. Taxpayers generally do not have standing to challenge government programs in federal court because any injury to the taxpayer from misappropriation of funds from the treasury is too remote and too attenuated to meet the "direct injury" requirement of Article III. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007); *Frothingham v. Mellon,* 262 U.S. 447 (1923). "Aggrieved individuals always have the option to take their concerns about expenditures to the political branches of government, but Article III controls whether the concerns can be addressed in federal court." *Tarsney v. O'Keefe*, 225 F.3d 929, 938 (8th Cir. 2000).

---

[4] For purposes of responding to Plaintiffs' taxpayer standing theory, State Defendants are not challenging Plaintiffs' art. III standing, but simply describing how Plaintiffs cannot use state taxpayer standing in federal court to create a presumption of irreparable harm.

Regarding state taxpayer standing, *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429 (1952), set the same course as *Frothingham*. "[W]e reiterate what the Court said of a federal statute as equally true when a state Act is assailed: 'The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.' " *Id.* at 434 (quoting *Frothingham*, 262 U.S. at 488). Under this framework, state taxpayer standing is coterminous with federal taxpayer standing and the "rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (citing *Booth v. Hvass*, 302 F.3d 849 (8th Cir. 2002)).

"Allowing state taxpayers to litigate claims of unconstitutional expenditures [in federal court] without having to show a direct injury would 'seriously undermine the constitutional commitment to federalism.'" *Tarsney*, 225 F.3d at 938 (citing *Colorado Taxpayers Union, Inc. v. Romer,* 963 F.2d 1394, 1403 (10th Cir. 1992)). "If taxpayers were granted standing to challenge state expenditures without demonstrating a direct injury, the ability of states to govern could be seriously impeded." *Id.* at 938. Without a finding of state taxpayer standing, Plaintiffs' irreparable harm theory falls apart.

Even assuming Plaintiffs' state taxpayer standing approach had any application in federal court, which it does not, the presumptions of irreparable harm Plaintiffs seek were rejected in *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006) (holding "the

decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity"). *eBay's* holding requires courts to view as suspect any general rule creating a presumption or an inference in favor of automatically imposing an injunction. *See Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010) ("[N]othing in the text or the logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context.")

The Eighth Circuit applied *eBay* in *Novus Franchising, Inc. v. Dawson,* when it affirmed a district court's denial of a preliminary injunction on the grounds that the plaintiff did not show irreparable harm, despite a state-law rule inferring irreparable harm. 725 F.3d 885 (8th Cir. 2013). This Court should likewise do so here. Just like the Eighth Circuit, "the Eleventh Circuit has suggested 'a strong case can be made that *eBay's* holding necessarily extends to the grant of preliminary injunctions' in contexts other than patent infringement cases." *Id.*, quoting *North Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1228 (11th Cir. 2008); *see also Salinger v. Colting*, 607 F.3d at 82 ("After *eBay*, however, courts must not simply presume irreparable harm. Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm."). Accordingly, for Aetna and Arbor to show irreparable harm in this Court, they must actually show irreparable harm to themselves, not rely on state-law presumptions. They cannot make such a showing.

## 2. Aetna's alleged irreparable harm based on its interests in the bidding process.

Aetna alone advances a second theory that its irreparable injury is based on the alleged deprivation of its "opportunity to meaningfully participate in a fair bidding process." Aetna Br. 48. Aetna rests this theory exclusively on *Glenwood Bridge, Inc., v. City of Minneapolis,* 940 F.2d 367 (8th Cir. 1991). Such reliance is misplaced, as *Glenwood Bridge* is distinguishable from the instant case in several key respects.

Aetna characterizes *Glenwood Bridge* as involving an improperly withdrawn public contract award,[5] which Aetna analogizes to its own circumstances. Among the central components of *Glenwood Bridge* was the plaintiff's request to enjoin the defendant's re-bidding of a public construction project, incorporated within which re-bidding was a pre-hire agreement entered into between the defendant and a particular labor union. *Id.* at 368. Elsewhere in its decision, the Eighth Circuit concluded the pre-hire agreement was likely illegal as a preempted effort by the defendant to interfere with free collective bargaining in violation of federal labor laws. *Id.* at 370-71. Critically, the Court held the plaintiff would be irreparably harmed by the re-bidding *because the plaintiff would effectively be precluded from participating in such re-bidding altogether, id.* at 372, presumably since the

---

[5] As a threshold matter, Aetna's description of the *Glenwood Bridge* case—from which the remainder of its argument is premised—misstates the facts of that case. Aetna describes *Glenwood Bridge* as "involv[ing] a claim by the initial *awardee…*" which the defendant "*withdrew.*" Aetna Br. 48 (emphasis added). But though the *Glenwood Bridge* plaintiff was the lowest when the bids were opened, no contract was ever awarded on the initial round of bidding. 940 F.2d at 367-68. Indeed, *all* initial bids were rejected. *Id.*

plaintiff's own collective bargaining agreement was with a different labor union than the one imposed (likely illegally) by the defendant. *Id.* at 368.

Here, to the extent DAS's limited rescoring of the Heritage Health bids can even be reasonably compared with the outright rejection of *all* bids and total re-bidding in *Glenwood Bridge*, that plaintiff's inability to even participate in the re-bidding is a significant distinction from this case. For here, it is undisputed that Aetna not only was not precluded from participating in the rescoring, *it did not object after receiving notification rescoring would occur.* Botelho Dec. ¶ 12. Simply put, the *Glenwood Bridge* plaintiff was precluded from even entering the bidding arena; here, Aetna was already there and remained voluntarily even as the rescoring commenced.

*Glenwood Bridge* is further distinguishable given how dependent the Eighth Circuit's finding of irreparable harm was on its threshold finding of likelihood of success on the merits. The Court conducted this part of its *Dataphase* analysis first, finding with little difficulty that the plaintiff made a sufficient showing that the defendant city's incorporation of and insistence on the pre-hire labor agreement illegally interfered with free collective bargaining protected by federal labor law. *Glenwood Bridge,* 940 F.2d at 370-71. The Court found the defendant city's alleged conduct comparable to other cases involving such interference and credited the plaintiff with raising "troubling questions about the [defendant city's] conduct." *Id.*

That is not the case here. As addressed elsewhere in this brief, Aetna's burden of establishing irreparable harm cannot be lightened, as was the *Glenwood Bridge* plaintiff's,

by its showing it is likely to succeed on the merits. Aetna has failed to make the requisite showing on this prong, with its varied claims suffering from facial defects including the absence of a right of action, the failure to plead a protected property interest, and sovereign immunity, among others.

The only two other cases cited by Aetna on this prong—both referenced in a footnote at Aetna Br. 50 n.19—are likewise unavailing to *either* Plaintiff's cause. One is a mid-1990s decision from the Middle District of Alabama involving a federal agency's effective veto of a state's award of a highway construction contract which was to utilize federal funds. *Clark Const. Co. v. Pena,* 895 F. Supp. 1483 (M.D. Ala. 1995). *Clark* is based virtually entirely on *federal* procurement law of limited applicability here, even for Plaintiffs' federal § 1983 claims. Moreover, the defendant *state* agency in *Clark* had, for its part, formally "accepted" the plaintiff's bid and had "selected [the plaintiff] as the proposed contract awardee," *id.* at 1488, circumstances which simply do not exist here.

Aetna's other case, a 1985 decision of the District of Minnesota which has not been cited by the Eighth Circuit even once—involved the bidding to install a *telephone system at a county government building* and clear evidence of deviation between the winning bid and the underlying specifications. *United Technologies Communications Co. v. Washington County Bd.,* 624 F. Supp. 185 (D. Minn. 1985). Most importantly as a point of comparison with this case, the Minnesota court specifically observed that no evidence had been presented to it regarding the harm an injunction would cause the defendant county. *Id.* at 189 ("[T]he parties have provided no evidence that the delay in selecting

a system will have an impact on either the construction schedule for the building or its date of readiness. No evidence has been provided suggesting that a later telephone installation would create structural complications which would delay completion of the building. In the total absence of evidence of serious physical and financial consequences, the principal burden imposed by delay remains the simple uncertainty of the system eventually to be installed.").

Indeed, *United Technologies* (and the underpinnings of Plaintiffs' "presumption of irreparable harm" theory) was criticized in a more recent decision of the same federal district court. *C.S. McCrossan Const., Inc. v. Minnesota Dept. of Transp.,* 946 F. Supp. 2d 851 (D. Minn. 2013). That decision, which directly contradicts Aetna's notion that "irreparable harm is established as a matter of law" in this case, Aetna Br. 50, is quoted here extensively given its applicability to this Court's analysis:

> In the undersigned's view, however, it is not enough for a plaintiff simply to point to a "tainted" bidding process and claim irreparable harm. *United Technologies* cited no authority for this "unique" proposition, which several federal courts have questioned. *See Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.,* 868 F.2d 1085, 1088 (9th Cir. 1989); *Advanced Seal Tech., Inc. v. Perry,* 873 F. Supp. 1144, 1149–50 (N.D. Ill. 1995); *see also Lametti & Sons, Inc. v. City of Davenport, Iowa,* 432 F.Supp. 713, 715 (S.D. Iowa 1977) (noting that "the integrity of the competitive bidding system [can] be adequately protected by a damage action").
> . . .
> At least two sound reasons support this conclusion. First, as stated in *Superior Services, Inc. v. Dalton,* 851 F.Supp. 381, 387 (S.D. Cal. 1994), **while "certain courts have concluded that injury to a right to a valid procurement process constitutes irreparable injury," if that were always the case, "an unsuccessful bidder could ... easily obtain a TRO by filing a protest," which would "substantially interfere with the provision of government services."** *Accord, e.g., San Diego Beverage &*

*Kup v. United States,* 997 F.Supp. 1343, 1347 (S.D. Cal. 1998). This Court does not believe that public contracting should be so easily compromised.

Second, under the logic espoused in *United Technologies,* "*every*" bid protest would involve an irreparable injury." *OAO Corp. v. United States,* 49 Fed. Cl. 478, 480 (2001) (emphasis added); *accord San Diego Beverage,* 997 F. Supp. at 1347. That is simply not the law. In *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 392–93, 126 S. Ct. 1837, 164 L.Ed.2d 641 (2006), the Supreme Court overturned a long line of cases granting injunctions as a matter of course upon a showing of patent infringement—that is, based on a *presumption* (rather than a *showing*) of irreparable harm due to the nature of the claim itself. Although *eBay* was a patent case, its holding has been extended to other types of actions. *See, e.g., Salinger v. Colting,* 607 F.3d 68, 77 (2d Cir. 2010) (copyright infringement); *Byrd v. Aaron's, Inc.,* C.A. No. 11–101, 2011 WL 2672009, at *8 & n. 6 (W.D. Pa. June 16, 2011) (Wiretap Act), *adopted,* 2011 WL 2672204 (W.D. Pa. July 8, 2011). Notably, *eBay* rejected the application of categorical rules in injunction cases and instructed lower courts to consider "traditional equitable principles" when deciding whether to grant relief. 547 U.S. at 391–94, 126 S. Ct. 1837; *see also WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 285 (2d Cir. 2012) ("[C]ourts may no longer simply presume irreparable harm; rather, plaintiffs must demonstrate that, on the facts of the case, the failure to issue an injunction would actually cause irreparable harm."). The Court perceives no obvious reason why *eBay* should not extend to this case—**the Court need not, and should not, presume irreparable harm to McCrossan simply because it may have been involved in a "flawed" MNDOT bidding process**.

. . .

**As in *OAO Corp.,* McCrossan's (purported) losses here are "primarily monetary": it has missed out on a contract that was awarded to a different contractor**. 49 Fed. Cl. at 480. Yet, it has long been held that **losses compensable in money damages are not irreparable**. *E.g., Watkins,* 346 F.3d at 846; *Gelco,* 811 F.2d at 420; *Sierra Military Health Servs., Inc. v. United States,* 58 Fed.Cl. 573, 582 (2003) (finding no irreparable harm where it was "clear that most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract"). Perhaps more importantly, it is not clear that missing out on the contract actually damaged McCrossan at all— that it would have profited on the contract is unsupported in the record and inherently conjectural. Furthermore, there is no guarantee McCrossan would have received the contract even in a "fair" bidding process, because

as noted above MNDOT retained the right to reject all of the proposals it received. *Lametti & Sons,* 432 F. Supp. at 715 (finding no irreparable harm because "[a] mere bidder acquires no legally enforceable contract right; the [contracting authority] could have rejected all of the bids"); *see also OAO Corp. v. United States,* 17 Cl. Ct. 91, 105 (1989).

*C.S. McCrossan,* 946 F. Supp. 2d at 858-60 (emphasis added).

Plaintiffs here should likewise not enjoy the benefit of any "presumption" of irreparable harm. As the irreparable harm analysis in *C.S. McCrossan* is directly applicable to the arguments supplied by Aetna and Arbor, the Court should employ such reasoning here and reject such a low-bar theory of irreparable harm.

### 3. Aetna's misappropriation of the interests of Medicaid beneficiaries and others.

Finally, Aetna's closing arguments on irreparable harm—which variously amount to Aetna's attempt to appropriate for its own commercial purposes the interests of Nebraska Medicaid beneficiaries and their medical services providers—should likewise be rejected. Aetna Br. 50-53.

Aetna purports concern for Nebraska Medicaid beneficiaries who will "inevitably" be "confused and prejudiced" if Aetna's incumbency is not maintained through the force of a preliminary injunction. Aetna Br. 50. Aetna's brief is devoid of any explanation of this "prejudice" and bases this conclusory claim on paragraphs of a declaration by Aetna's own CEO (an inherently biased source) which themselves do not even include that word. *Id.* (citing Copley Dec., Filing 23-1 ¶¶ 34-35). As part of

this claimed "prejudice," Aetna states that "[a]ll 105,000 Medicaid beneficiaries currently served by [Aetna] will need to re-enroll with the new MCOs." *Id.*

Aetna's worries extend to the "more than 10,000 providers of medical services" to Nebraskans, which include "doctors, hospitals, therapists, pharmacies and other medical care providers." *Id.* (citing Copley Dec., Filing 23-1 ¶ 32). Aetna correctly observes that unless the status quo (*i.e.,* Aetna's incumbency) is maintained, "all of these provider contracts with [Aetna] will be terminated, and those providers will all be required to decide whether to execute new contracts with the three new MCOs." *Id.* (citing Copley Dec., Filing 23-1 ¶¶ 32-33).

Putting aside the critical fact that none of these "harms" will be suffered by Aetna *itself, Dataphase,* 640 F.2d at 114 (irreparable harm must be shown "to the movant"), the fundamental defect in Aetna's argument is that precisely such transitions would come to pass under virtually any conceivable outcome, *including if Aetna itself were among the winning MCOs.* For even if Aetna were among the winners for the unified Heritage Health system, its share of that system would necessarily differ from its incumbent status for physical health. This means that notwithstanding the facial inappropriateness of Aetna's attempt to arm itself, as the loser of a revenue-rich Medicaid contract, with the potential arguments of Medicaid patients and doctors, the argument itself is nonsensical in any event because the same patients and doctors would have to transition to new care schemes even if Aetna had gotten exactly what it wanted.

Aetna's argument suffers from the fatal flaw of assuming that any deviation from its own self-serving definition of "the status quo" constitutes irreparable harm. While Aetna's position is understandable given the commercial context upon which it is based, it simply does not and could not could not serve to establish the irreparable harm necessary for the issuance of a preliminary injunction. For this reason and for the others set forth in this subpart, the Court should adopt the approach recently taken by its sister court in *C.S. McCrossan,* conclude Plaintiffs have failed to show irreparable harm, and deny their motions on this basis alone.

## C. Neither Plaintiff is likely to succeed on its claims.

### 1. Claims arising under federal law.

#### a. Plaintiffs' due process claims are unlikely to succeed because failed bidders do not hold a property interest in the award of a public contract.

Plaintiffs' claims that the rescoring violated their due process rights are doomed to fail in the absence of a cognizable property interest.[6]

To state a claim under the Fourteenth Amendment's Due Process Clause, a plaintiff must allege the deprivation of a protected interest without due process of

---

[6] Several of Plaintiffs' federal claims fail as a matter of law automatically, with little analysis needed. Plaintiffs named the Nebraska Department of Administrative Services and the Nebraska Department of Health and Human Services in this action. Since State agencies, as arms of the State itself, are not "persons" subject to suit under 42 U.S.C. § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989), any § 1983 claims against DAS and DHHS must be summarily dismissed.

law. *Demien Construction Co. v. O'Fallon Fire Protection District*, 812 F.3d 654, 658 (8th Cir. 2016); *Barnes v. City of Omaha*, 574 F.3d 1003, 1005-06 (8th Cir. 2009). "Protected interests under the Due Process Clause are those to which a person holds a 'legitimate claim of entitlement,' and stem from 'independent source[s] such as state law.'" *Id.,* (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972).

Generally, an unsuccessful bidder obtains no property right in the award of a contract. *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, No. 15-1222, 2016 WL 690849, at *4 (8th Cir. Feb. 22, 2016) (applying Missouri law). The same principle can be found in Nebraska law. *See Day v. City of Beatrice*, 169 Neb. 858 (Neb. 1960) (stating that "[o]rdinarily an unsuccessful bidder for public work has acquired no legal right to protect, either in law or equity, since the letting of contracts to the lowest bidder is regarded as being for the benefit of the public and not for individual bidders."). Moreover, the Supreme Court has explicitly held that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005); *see also*, *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462-63 (1989).

The mere expectation of the award of a contract does not give rise to a cognizable due process claim. It is established in Nebraska and most other jurisdictions that a party whose bid proposal was not accepted does not acquire any rights in and to the contract. For example, the Nebraska Supreme Court in *Day v. City of Beatrice* held that "[a]n unsuccessful bidder has no contractual right to enforce…. It was a proposal only that bound neither party, and as it was never consummated by a contract the city acquired no rights against the plaintiff nor he against the city." *Day*, 169 Neb. at 866.

The Nebraska Supreme Court has long concluded that public officials possess a discretionary power in awarding contracts. *Day*, 169 Neb. at 864. Nebraska law also recognizes that government officials have broad discretion in considering bid proposals for public contracts under the competitive bidding statutes. *See Rath v. City of Sutton,* 267 Neb. 265 (2004). "[W]henever a public body has discretion to make a decision during the bidding process, a court is essentially limited to reviewing that decision for bad faith." *Id.* at 285. Likewise, "it is not the province of a court to interfere and substitute its judgment for that of the administrative body." *Id.* at 284.

Notably, Arbor relies exclusively on *Demien Cosntr. Co. v. O'Fallon Fire Prot. Dist.* on this issue. Arbor Br. 21. Though the *Demien* Court concluded that under Missouri law an unsuccessful bidder may have standing to challenge a contract award, it likewise held that *nothing in Missouri state law establishes a protected property interest. Demien Const. Co. v. O'Fallon Fire Prot. Dist.*, 812 F.3d 654, 658 (8th Cir. 2016). Neither Arbor nor Aetna

points to any case that has determined that, as a matter of Nebraska law, a bidder has a protected property interest.

Neither Aetna nor Arbor have established a cognizable property interest in the underlying circumstances. This Court, as recently as this year, reaffirmed the principle that an unsuccessful bidder generally obtains no property right in the award of a public contract. *Reddick Mgmt. Corp. v. City of Omaha, Nebraska*, No. 8:16CV99, 2016 WL 1627608, at *4 (D. Neb. Apr. 22, 2016) (citing *Higgins, supra*). It should do so again here given that neither Aetna nor Arbor were never awarded the contract and had no expectation of such an award.[7]

## b. Claims under 45 C.F.R. § 75.326.

Both Plaintiffs variously allege that 45 C.F.R. § 75.326—a regulation promulgated under the Medicaid Act requiring that a state must follow the same policies and procedures for procurements using federal funds as it uses for procurements using

---

[7] Alternatively, Plaintiffs have not claimed that the DAS grievance process was constitutionally insufficient. The Plaintiffs enjoyed adequate post-"deprivation" remedies even if the Court concludes they held a protected property interest. Due process guarantees pertaining to property are satisfied when an adequate, post-deprivation remedy exists. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The DAS Protest/Grievance Procedure outlines the policy and procedures available to vendors who want to challenge the award of a bid. Exhibit B to Botelho Dec. This procedure is available to all bidders. Botelho Dec. ¶ 11. While Arbor made use of this process after the initial scoring, *see* Aetna Filing 23-11, Aetna was silent when the rescoring was announced, submitting a protest only after the now anomaly-free rescoring resulted in its bid falling out of the initial (and flawed) top three ranking. Aetna Filing 23-32. Since the DAS procedure on its face adequately safeguarded Plaintiffs' due process rights, providing each a meaningful opportunity to be heard (when actually invoked), Plaintiffs' due process claims could be dismissed for this alternative reason.

its non-federal funds—was violated by State Defendants. Both Plaintiffs' complaints align this claim as being brought under 42 U.S.C. § 1983, Aetna Complaint, Filing 1-1 ¶¶ 111-117; Arbor Complaint, Filing 1-1 ¶¶ 66-71, and Aetna's brief frames it as a Supremacy Clause claim. Aetna Br. 42-44 (Arbor's brief hardly addresses the issue, beyond oblique references to 45 C.F.R. § 75.326 within its general arguments that Nebraska's procurement statutes were violated).

Regardless of its framing, however, this claim fails as a matter of law for any of several easily discernible reasons.

### i. Failure to allege differentiated procurement policies.

In the following subsection, State Defendants will demonstrate why Plaintiffs lack a private right of action to enforce 45 C.F.R. § 75.326 under the Supreme Court's three-part test established in *Blessing v. Freestone,* 520 U.S. 329 (1997). Though this would ordinarily be deployed as a threshold means of disposing of Plaintiffs' claim, an even narrower basis exists which obviates the Court's need to conduct *Blessing* analysis.

Plaintiffs are attracted to the opening sentence of 45 C.F.R. § 75.326, which reads: "When procuring property and services under a Federal award, a state must follow the same policies and procedures it uses for procurements from its non-Federal funds." Plaintiffs' contention is that the rescoring and the manner in which the rescoring was conducted deviated from the process established by the Manual, which in turn is how the State conducts its procurements using non-federal funds. Aetna

Complaint, Filing 1-1 ¶ 117; Arbor Complaint, Filing 1-1 ¶ 70. Their theory is entirely contingent on the Court otherwise concluding that the Manual, a non-regulatory guidance document, sets forth the exclusive process for procurements by the State. As comprehensively established elsewhere in this brief (specifically in subsection I(C)(2)(a)(i) below), this is simply untrue as a matter of law.

Neb. Rev. Stat. § 73-504(2) provides, in pertinent part: "All proposed state agency contracts for services in excess of fifty thousand dollars shall be bid in the manner prescribed by the division procurement manual **or a process approved by the Director of Administrative Services.**" (emphasis added). Here, though the rescoring was not specifically prescribed by the Manual, it was conducted pursuant to a process "approved by" the DAS Director, as he himself has testified. Diamond Dec. ¶ 9.

Plaintiffs' complaints are devoid of any allegation that such a Director-approved process is used exclusively for procurements involving the use of federal funds, nor have the Plaintiffs specifically alleged a differentiated application of Neb. Rev. Stat. § 73-504(2) for procurements using federal funds versus those using non-federal funds. Thus, even if Plaintiffs had a right of action to enforce 45 C.F.R. § 75.326 (they do not), their pleadings facially fail to state a substantive claim upon which relief can be granted, necessarily meaning they are unlikely to succeed for preliminary injunction purposes.

### ii. No private right of action.

In any event, Plaintiffs lack a private right of action to enforce 45 C.F.R. § 75.326. To proceed, Plaintiffs "must assert the violation of a federal *right*, not merely a violation

of federal *law*." *Blessing,* 520 U.S. at 340 (emphasis original). "For legislation enacted pursuant to Congress's spending power, like the Medicaid Act, a state's non-compliance typically does not create a private right of action for individual plaintiffs, but rather an action by the federal government to terminate federal matching funds." *Lankford v. Sherman*, 451 F.3d 496, 508 (8th Cir. 2006).

A three-part test determines whether Spending Clause legislation creates a right of action under 42 U.S.C. § 1983: (1) Congress intended the statutory provision to benefit the plaintiff; (2) the asserted right is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the provision clearly imposes a mandatory obligation upon the states. *Id.* (citing *Blessing,* 520 U.S. at 340-41). At minimum, the first prong of the *Blessing* test is clearly not satisfied here.

*First,* as an initial and obvious matter, the *Blessing* inquiry relates to determining whether a "*statutory provision*" creates a right of action. *See id.* (emphasis added) 45 C.F.R. § 75.326 is a regulation, not a statute. This is not a trivial detail, as the Eighth Circuit and other Courts of Appeals have specifically observed. *See, e.g., Midwest Foster Care and Adoption Ass'n v. Kincade,* 712 F.3d 1190, 1198 n.5 (8th Cir. 2013) ("We are cognizant of the responsibility to tether our analysis to congressional intent, rather than an agency's implementing regulations.") (citing *Save Our Valley v. Sound Transit,* 335 F.3d 932, 939 (9th Cir. 2003) ("[A]gency regulations cannot independently create rights enforceable through § 1983.")); *see also Shakhnes v. Berlin,* 689 F.3d 244, 251 (2d Cir. 2012) (relying on *Save Our Valley,* the Second Circuit confirmed that though regulations could be

"relevant" in determining whether an underlying statute creates a right of action, one that "goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision" is too far removed from the statute to be actionable); *Johnson v. City of Detroit,* 446 F.3d 614, 627-29 (6th Cir. 2006); *S. Camden Citizens in Action v. N.J. Dep't of Env. Prot.,* 274 F.3d 771, 787-90 (3d Cir. 2001).

These holdings are fully consistent with (and, indeed, several build upon) the Supreme Court's post-*Blessing* clarification on the importance of determining *Congress's* intent:

> We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.
> …
> We have recognized that whether a statutory violation may be enforced through § 1983 "is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." But the inquiries overlap in one meaningful respect—in either case we must first determine whether **Congress** *intended to create a federal right.*

*Gonzaga Univ. v. Doe,* 536 U.S. 273, 283 (2002) (citation omitted; emphasis added in part). Since the "right" Plaintiffs assert is claimed under a regulation, the Court is unable to determine whether it is one *Congress* intended to create. Their 45 C.F.R. § 75.326 claims fail for this threshold reason.

*Second,* even if Plaintiffs' claims were tied to a provision of the Medicaid Act itself, it is far from clear that Plaintiffs—two commercial enterprises who respectively failed to obtain contracts to administer hundreds of millions of dollars in Medicaid benefits—

are the congressionally-intended beneficiaries they purport to be. To establish that they are, Plaintiffs must identify a statute "phrased 'with an *unmistakable focus* on the benefited class.'" *Gonzaga,* 536 U.S. at 285 (emphasis original). And even if they could identify a statute phrased in such explicit rights-creating terms, they would still need to show that "the statute manifests an intent 'to create not just a private *right* but also a private *remedy.*'" *Id.* (emphasis original) (quoting *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001)).

In at least one strikingly analogous scenario, a federal appeals court has firmly held that no such right or remedy exists for disappointed bidders for contracts to provide managed care to Medicaid beneficiaries. In *AlohaCare v. Hawaii Dept. of Human Services,* 572 F.3d 740 (9th Cir. 2009), the Ninth Circuit rejected claims by a group of federally qualified healthcare organizations which had unsuccessfully bid on a contract to provide managed health care to Medicaid-eligible aged, blind, and disabled individuals. The case turned on whether 42 U.S.C. § 1396b(m)—a provision within the Medicaid Act's broader scheme for the allocation and receipt of federal funds to states which defines managed care organizations and prescribed conditions for the reimbursement of Medicaid expenditures—confers a federal right to contract eligibility that could be remedied by § 1983. *Id.*

The court held that disappointed bidders possess no such right, concluding with ease that, "the [statutory] provisions entirely lack the sort of 'rights-creating' language critical to showing the requisite intent to create new rights." *Id.* at 746 (quoting *Gonzaga,* 536 U.S. at 287). Regarding the *statute's* reimbursement conditions, the court

characterized that the provision is "focused on the procedural requirements of the Medicaid Act and is squarely directed to governmental agencies and phrased in aggregate terms." *Id.* (citation omitted). Such language could likewise describe the fundamentally procedural *regulatory* provision championed by the Plaintiffs here. Ultimately, the court concluded that the plaintiff managed care contract bidders were "simply cogs in a grander statutory scheme." *Id.*

That inquiry, employed here, would be substantively fatal to Plaintiffs' theory regarding 45 C.F.R. § 75.326. But *AlohaCare* confirmed, as State Defendants established in their preceding argument, that Plaintiffs are not even entitled to that measure of analysis, since Plaintiffs' challenge comes under a regulation and not a statute. For when the *AlohaCare* court turned to the plaintiffs' alternative arguments that Medicaid Act regulations demonstrated the congressional intent that 42 U.S.C. § 1396b(m) could not, the court rejected such arguments, swiftly concluding that they "[p]laintiffs suing under § 1983 must demonstrate that a *statute*—not a regulation—confers an individual right." *Id.* at 747 (quoting *Save Our Valley,* 335 F.3d at 943 (see mention of *Save Our Valley* in immediately preceding argument and the Eighth Circuit's citation to the same at *Midwest Foster Care,* 712 F.3d at 1198 n.5)).

Aetna omits mention of this battery of authority. Aetna instead relies primarily on *Ctr. for Special Needs Tr. Admin., Inc. v. Olson,* 676 F.3d 688 (8th Cir. 2012)—a case readily distinguishable on the grounds that the plaintiff sought to enforce a *statute*—and a single 1988 case from the District of Connecticut. That case, *Connecticut Legal Services,*

*Inc. v. Heintz,* 689 F. Supp. 82 (D. Conn. 1988), is of obviously limited utility given that it predates *Blessing, Sandoval, Gonzaga,* and all other appellate decisions building on and clarifying those seminal cases. Notably, the plaintiff in that case specifically disavowed having a property interest in the underlying contract, *id.* at 85, and instead focused its claims on alleged failures to follow the procurement standards set forth in a Circular contained within the Medicaid regulations. *Id.* at 85-90. For all of the reasons already stated, *Connecticut Legal Services* would likely produce a different result today.

For either of the foregoing reasons, Plaintiffs have failed to state a claim on their allegations under 45 C.F.R. § 75.326 and are accordingly unlikely to succeed on the merits of such claims.

## 2. Claims arising under Nebraska law

Neb. Const. art. V, § 22, provides that "[t]he state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." *Engler v. State Accountability & Disclosure Comm'n*, 283 Neb. 985, 991 (2012). This provision of the Constitution is not self-executing, but instead requires legislative action for waiver of the State's sovereign immunity. *Id.* Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against the waiver. *Id.* A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction. *Id.*

### a. Claims under the Nebraska APA.

#### i. Absence of a rule or regulation.

Aetna and Arbor are disappointed bidders who allege violations of the DAS Agency Procurement Manual for Services (the "Manual") under Neb. Rev. Stat. § 84-911 in an attempt to avoid the sovereign immunity bar to their state law claims. Plaintiffs also disagree with the grievance process. But the limited waiver of sovereign immunity granted by § 84-911 does not confer jurisdiction unless Plaintiffs challenge the validity of an actual rule or regulation. Since the Manual and grievance process are not rules or regulations and Plaintiffs are not challenging the validity of any rule or regulation, their § 84-911 claims must fail as a matter of law.

#### ii. Failure to challenge a rule or regulation.

For Plaintiffs to prevail under the APA, this Court must find that a challenged "rule or regulation" is invalid under Neb. Rev. Stat. § 84-901(2) (Reissue 2008). Since Plaintiffs failed to challenge anything constituting a rule or regulation, the limited statutory waiver of sovereign immunity provided by § 84-911 does not apply.

For purposes of the Administrative Procedure Act:

Rule or regulation shall mean any rule, regulation, or standard issued by an agency, including the amendment or repeal thereof whether with or without prior hearing and designed to implement, interpret, or make specific the law enforced or administered by it or governing its organization or procedure.

Neb. Rev. Stat. § 84-901(2) (Reissue 2008). Neither the Manual nor the DAS grievance process constitute rules or regulations.

<u>*The Manual is not a rule or regulation*</u>

The Manual is a guide developed by the State Purchasing Bureau to assist agencies and vendors with the procurement process. Aetna Filing 23-35 at 3. The Manual does not have the authority of law, rule or regulation, is not subject to promulgation under the APA, and was not promulgated in the Nebraska Administrative Code. (Diamond Dec. ¶ 6). The Manual itself contains the following prominently displayed disclaimer:

> Nothing contained herein shall be construed to amend or override any statute, rule or regulation, policy or procedure of the State of Nebraska. The State Purchasing Bureau reserves the right to modify this manual without prior notice and without issuance of such modification to all holders of this manual.

Aetna Filing 23-5 at 2.

Moreover, the Nebraska Legislature declined to require that DAS adopt the manual as a rule or regulation. Other than proclaiming that manuals have the force of law, Aetna Br. 32, Plaintiffs provide no basis and cite no authority supporting their conclusory statement that such a guidance manual is automatically a rule or regulation.

Like its counterparts in other states, the APA as originally enacted was based on the 1946 Model State Administrative Procedure Act prepared by the National Conference of Commissioners on Uniform State Laws. In order to define "rule or regulation" in broadly inclusive terms, the word "statement" was a popular component of the definition. F. Cooper, State Administrative Law, at 108 (1st ed. 1965). This was "necessary to defeat the inclination shown by some agencies to label as 'bulletins,'

'announcements, 'guides,' 'interpretive bulletins,' and the like . . . to assert that their promulgations are not technically rules but merely policy statements, and hence may be issued without observance of the procedures required in connection with the adoption of rules." *Id.* Specifically, in Iowa, the term "statement" was added to eliminate what was characterized as "widespread evasion of rulemaking procedures . . . on the grounds that the agency action in question was not a 'rule, regulation, order or standard,' but was instead a 'manual,' 'memo,' 'guideline' or 'policy.'" Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L. Rev. 731, 827 (1975); *see also* Alaska Stat. Ann. § 44.62.640 ("regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations").

Nebraska took the opposite approach and rejected such a construction. In 1959, the Nebraska Legislature affirmatively rejected an attempt to expand the definition of rule or regulation under § 84-901(2). LB 362 proposed expanding this definition to include "statement[s] of policy." 1959 Neb. Laws, L.B. 362. But, after objections were raised in the Judiciary Committee hearing on the bill, this proposed amendment was stricken, along with other then-existing language applying the definition of rule or regulation to "any policy," "so that the bill would not apply to mere statements of policy . . ." Committee Statement, L.B. 362, Judiciary Committee, 69th Leg. Sess. (April 15, 1959). "Such action or inaction, as the case may be, on the part of the Legislature is persuasive and indicates a legislative intention to affirmatively reject [a statutory

construction]." *Schultz v. Sch. Dist. of Dorchester in Saline Cty.*, 192 Neb. 492, 497 (Neb. 1974). Accordingly, the Nebraska Legislature has rejected the inclusion of manuals within the definition of "rule or regulation."

<u>*The grievance process is not a rule or regulation*</u>

Plaintiffs likewise attempt to cast the grievance process as a rule or regulation. But like the Manual, the grievance process was developed to assist vendors in submitting a protest and provides the vendors an opportunity to alert DAS of irregularities in the bidding process. The grievance process does not have the authority of law, rule or regulation, is not subject to promulgation under the Administrative Procedure Act, and was not promulgated in the Administrative Code. The Nebraska Legislature did not enact any legislation requiring DAS to adopt the grievance process as a rule or regulation.

Additionally, no two protests are the same. Botelho Dec. ¶ 7. "Each requires unique considerations and unique remedies when necessary, making it impossible to anticipate and address in a manual every potential reason and remedy for a protest." *Id.*

The uniqueness of each protest also underscores why Plaintiffs' claims regarding this particular protest may be moot, or at least time barred under Neb. Rev. Stat. § 84-917. The very process they ostensibly seek to enjoin has already occurred. While Plaintiffs *may* be involved in a future bidding process, it is merely hypothetical that they would be involved in a protest, let alone ones substantially similar to those they initiated here. Plaintiffs' challenge to this specific protest and remedy more closely resembles a

challenge to a final decision in a contested case under § 84-917 than a challenge to a rule or regulation under § 84-911.

Regardless, Plaintiffs' underlying contention is that even if DAS was authorized to utilize such a process, it should have been in accordance with the Manual. *See* Aetna Br. 28. But, as established above, since the Manual is not a rule or regulation, Plaintiffs cannot challenge it under § 84-911.

### iii. Even if the DAS procurement manual constituted a rule or regulation, Plaintiffs have not challenged its validity.

Plaintiffs attempt to improperly use § 84-911 to challenge perceived violations of the Manual, *but not the validity of the Manual itself*. Aetna Br. 34 ("In rescoring the proposals in this procurement, Defendants directly and repeatedly violated the Manual."); *Id.* at 31 ("*At a minimum*, any rescoring had to be conducted in accordance with the Manual."); *Id.* at 28 ("Nor does the Manual or the RFP provide for any rescoring or reevaluation."); *Id.* at 26 ("DAS had no discretion to deviate from the policies and procedures outlined in the Manual."); Arbor Br. 11 ("RFP was not conducted according to the requirements of the Manual."). Despite whatever part these perceived violations of the Manual may play in Plaintiffs' storyline, they do not form the basis for a claim that a rule or regulation is invalid under § 84-911.

Aetna primarily relies on *Davio v. Neb. Dep't of Health & Human Servs.*, 280 Neb. 263 (2010)(declaring Regulation 2–020.09B2f invalid), for the proposition that it can achieve injunctive relief under § 84-911 in this instance. But Aetna omits that *Davio* was

a challenge to the validity of a regulation under § 84-911. Since Plaintiffs have not challenged the validity of a rule or regulation, *Davio* provides Plaintiffs no support for their § 84-911 claims that do not challenge a rule or regulation.

In sum, Plaintiffs present various reasons why they allege State Defendants may have violated the Manual. But the limited statutory waiver of sovereign immunity provided by § 84-911 is for challenges to the validity of rules or regulations, not to challenge alleged violations of the same. Since the Manual is not a rule or regulation, and since Plaintiffs are not challenging the validity of a rule or regulation, they are unable to succeed on the merits of their claims under § 84-911.

### iv. Substantively, no provision of the DAS procurement manual was violated.

In light of the foregoing, the Court's analysis of Plaintiffs' § 84-911 claims should end and the Court should find Plaintiffs are unlikely to achieve success on the merits. However, for completeness, State Defendants will briefly address Plaintiffs' allegations that the Manual was violated. To the extent State Defendants addressed any of the following allegations in their response to the Plaintiffs' statements of fact above, the following additional explanations serve as supplemental responses.

*Allegation 1: DAS could not deviate from the Manual in any instance.*

Plaintiffs do not identify any statutory provision commanding that in all instances DAS must follow the Manual. Plaintiffs rely heavily on the first part of Neb. Rev. Stat. § 73-504(2) stating the contract "shall be bid in the manner prescribed by the division

procurement manual" and argue such statement "eliminates any discretion." However, Plaintiffs virtually ignore the second half of the provision providing discretion: "***or a process approved by the Director of Administrative Services***." § 73-504(2) (emphasis added). Here, "all procedures regarding the Heritage Health RFP and the associated grievance processes ***were approved***" by the Director. Diamond Dec. ¶ 9 (emphasis added). "Whenever a public body has discretion to make a decision during the bidding process, a court is essentially limited to reviewing that decision for bad faith." *Rath v. City of Sutton*, 267 Neb. at 285.

To that end, the entire universe of evidence presented by the Plaintiffs in support of their motions for preliminary injunction is utterly devoid of any evidence that could support the inference of bad faith.

*Allegation 2: DAS was not authorized to conduct the rescoring.*

Again, the DAS Director had the authority to authorize the rescoring process pursuant to Neb. Rev. Stat. § 73-504(2). The initial scoring anomaly was unfair to all bidders and compromised the integrity of the bidding process. Botelho Dec. ¶ 12. "As such DAS announced that remedial actions would be utilized. There were no objections by any bidder to DAS' announcement that remedial actions would be utilized." *Id.*

Aetna essentially argues that even if the initial scoring anomaly needed to be remedied, DAS lacked the authority to pursue any remedy and, if DAS possessed such authority, it could only be remedied in such a way that maintained the original outcome. Aetna Br. 27. Aetna identifies no authority for this assertion. Indeed, such a principle

would undermine the express legislative purpose to establish an "open and fair process for selection of contractual services." Neb. Rev. Stat. § 73-501. Moreover, this argument is inconsistent with the statutory power held by the DAS Director to approve a non-Manual bound process in execution of his duties under the procurement laws. *See* Neb. Rev. Stat. § 73-504(2).

*Allegation 3: The rescoring was not done by subject matter experts because the new evaluators did not have experience in evaluating Medicaid managed care proposals.*

The evidence shows rescoring of the Corporate Overview section was conducted by evaluators experienced in business and with experience evaluating corporate responsibility. Diamond Dec. ¶ 16(f); Stahly Dec. ¶¶ 4, 5, 11, 12; Broz Dec. ¶¶ 4, 5, 11, 12. The Scoring Manual *recommends* the evaluators have "appropriate expertise" and these evaluators were selected for the expertise regarding corporate responsibility. Aetna Filing 23-6 at 3. The section reviewed by these evaluators "did not deal with any technical Medicaid issues" and in the judgment of the DAS Director, "the new evaluators were all qualified." Diamond Dec. ¶ 16(f); *see also* Botelho Dec. ¶¶ 13-14; Stahly Dec. ¶ 10; Broz Dec. ¶ 10.

*Allegation 4: The new evaluators improperly only scored the Corporate Overview section.*

Again, the DAS Director had the authority to authorize the rescoring process pursuant to Neb. Rev. Stat. 73-504(2). The initial scoring anomaly was unfair to all bidders and compromised the integrity of the bidding process. Botelho Dec. ¶ 12. "As such DAS announced that remedial actions would be utilized. There were no objections

by any bidder to DAS' announcement that remedial actions would be utilized." *Id.* That remedial action consisted of a limited reevaluation of the Corporate Overview section, the section with the identified scoring anomaly. Aetna Filing 23-35 at 1.

*Allegation 5: The evaluators improperly communicated during the scoring process.*

The Manual states the "Evaluators should not discuss the scoring amongst themselves or with anyone else until after the score sheets have been turned in." Aetna Filing 23-5 at 33. Aetna recasts this as a prohibition on all communications when it is not. The communications provided by Aetna stating the evaluation was "daunting," Aetna Filing 23-24, where to find specific pages of a proposal, Aetna Filing 23-25, and thanking another for the page reference, Aetna Filing 23-26, were not impermissible communications regarding *the scoring*. These communications concerned where to find documents to conduct the scoring and did not concern the substance of the scoring.

*Allegation 6: The corrected scoring methodology violated the terms of the Manual.*

The Manual states that DAS will establish how the proposals will be evaluated, identify the major criteria critical to the success of the project, evaluate the RFPs according to the criteria, detail how much the criteria is worth, and establish an evaluation committee from a group of subject matter experts. Aetna Filing 23-5 at 25. The evidence establishes DHHS authored the RFP and determined the weight and importance regarding each of the RFP sections based on their needs and goals, and that such development of the RFP is typical and approved by the DAS Director. Diamond Dec. ¶ 8.

The initial protests revealed that at least one evaluator did not follow the Corporate Overview scoring instructions. Aetna Filing 23-12 at 7. "To eliminate the possibility of an evaluator manipulating the award outcome by either an attempt to preserve the previous scores or alter the scores to produce a desired result, it was determined that permitting an evaluator to 'correct' his or her score was not preferable to a rescore by new evaluators." Aetna Filing 23-35 at 1; Diamond Dec. ¶ 16(e). "Having new evaluators rescore the entire corporate overview section allowed an objection review of all questions related to the businesses to reduce the likelihood of bias or over-emphasis on certain questions." Diamond Dec. ¶ 16(b).

A flaw was also identified in the scoring instructions where evaluators for certain questions were allowed no discretion and instead used an all-or-nothing approach, or one of three scores, a full-, partial-, or no-credit approach. This initial methodology was inconsistent with the language of the RFP that "The State will evaluate the facts and will score the bidder's proposal accordingly." RFP at 215, available at: http://bit.ly/29VI4QS. This initial scoring method provided points for merely providing information, no matter how negative it was, and did not allow discretion based on the substance of the response.

The revised scoring method corrected this flaw and allowed for evaluators to evaluate the facts and score in accordance with their individual evaluation of the information provided. "The scoring methodology changed only to the extent that it prevented an absurd result in that a responsible bidder with no negative history could

receive 0 points for accurately failing to provide any negative information while an irresponsible bidder could be awarded 5 points for honestly pointing out their troubled past. Such a result would be contrary to the public interest." Diamond Dec. ¶ 16(a).

There was no objection by any bidder to DAS's announcement that remedial actions would be utilized as a result of the initial scoring anomaly. Botelho Dec. ¶ 12; Diamond Dec. ¶ 16(d). Rescoring of the corporate overview process did not change the scoring methodology in any material way with the exception of remedying the discrete scoring anomaly described above. The questions did not change, the maximum number of points did not change, and the weight of the section did not change. Botelho Dec. ¶ 15. The original scoring ratio was preserved. Aetna Filing 23-35 at 2. Having the new evaluators score all seven questions of the corporate overview section rather than just the four questions provided fair, impartial, coherent, and consistent review. Aetna Filing 23-35 at 2.

### b.  Claims under Nebraska's Declaratory Judgments Act.

### i.     Sovereign immunity.

Beyond a single citation by Aetna to the text of the Uniform Declaratory Judgments Act ("UDJA"), neither Aetna nor Arbor make any argument in their briefs regarding their supposed likelihood of success on their UDJA claims. For completeness, State Defendants will show how Aetna is unlikely to succeed on the UDJA claims raised in its Complaint. Aetna Complaint, Filing 1-1 ¶¶ 88-96. Arbor's only reference to the UDJA in its Complaint is in the jurisdictional statement. Arbor Complaint, Filing 1-1 ¶

9. Arbor's Complaint is so devoid of specificity that it is impossible to determine which count or cause of action Arbor intends to pursue under the UDJA. Given this, State Defendants will do their utmost to separately delineate and address each Plaintiffs' varied and otherwise blended arguments.

The Nebraska UDJA provides, in pertinent part:

> Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Neb. Rev. Stat. § 25-21,150. "The decision whether to entertain an action for declaratory judgment is within the discretion of the trial court." *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.,* 268 Neb. 439 (2004).

The Nebraska Supreme Court has repeatedly held that the UDJA does not waive the State's sovereign immunity, and a plaintiff who seeks declaratory relief against the State must find authorization for such remedy outside the Act. In *Riley v. State,* the Supreme Court found: "An action for a declaratory judgment cannot be maintained against the state without its consent because the state's immunity from suit is unaffected by the declaratory judgment statutes…" 244 Neb. 250, 256 (1993). For purposes of bringing standalone UDJA claims, neither Plaintiff has identified any authorization for such claims outside the Act.

*First,* Aetna seeks a declaration of its rights, status or other legal relations affected

by *state and federal regulations* under the UDJA. Aetna Complaint, Filing 1-1 ¶¶ 92-94, 96. But the UDJA does not apply to regulations. *See Baker's Supermarkets, Inc. v. State, Dep't of Agric.*, 248 Neb. 984 (1995) (disapproved of on other grounds by *Am. Amusements Co. v. Nebraska Dep't of Revenue*, 282 Neb. 908 (2011)).

*Second*, Aetna seeks a declaration related to its alleged "interest under a written contract or other writings constituting a contract, including but not limited to the RFP, the Intent to Award, and the MCO contract." Aetna Complaint, Filing 1-1 ¶ 91. Since Plaintiffs are not persons interested in a written contract or other writings constituting a contract pursuant to Neb. Rev. Stat. § 25-21,150, they cannot pursue a declaratory judgment action under § 25-21,150's contract provision. Even if one of these items constituted a contract between Aetna and the State, Aetna's claim would fail because Aetna failed to comply with the State Contract Claims Act, likewise resulting in a sovereign immunity bar. *See* Neb. Rev. Stat. § 81-8,302 *et seq.*; *Zawaideh v. Nebraska Dep't of Health & Human Servs. Regulation & Licensure*, 285 Neb. 48, 56 (2013).

*Third*, while Plaintiffs characterize their requested relief under Nebraska law as injunctive, entering the injunction Plaintiffs seek would force the State to reopen the RFP process (Plaintiffs' ultimate goal) and compel affirmative actions on behalf of the State requiring the expenditure of public funds. "[S]overeign immunity bars suits to compel affirmative actions that require a state official to expend public funds." *Doe v. Bd. of Regents of Univ. of Nebraska*, 280 Neb. 492, 511 (2010).

*Finally*, even if Plaintiffs could pursue their claims under the UDJA, they are not entitled to any relief given their failure to show any violation of Nebraska law. In *Rath v. City of Sutton*, the Nebraska Supreme Court held:

> Recognizing that public bodies exercise an official discretion when awarding bids, we have stated that courts will show deference when reviewing challenges to a public body's responsibility determinations and award decisions. Where there is a showing that the administrative body, in exercising its judgment, acts from honest convictions, based upon facts, and as it believes for the best interests of its municipality, and where there is no showing that the body acts arbitrarily, or from favoritism, ill will, fraud, collusion, or other such motives, it is not the province of a court to interfere and substitute its judgment for that of the administrative body. *Best v. City of Omaha*, 138 Neb. 325, 328, 293 N.W. 116, 118 (1940). **In other words, whenever a public body has discretion to make a decision during the bidding process, a court is essentially limited to reviewing that decision for bad faith**. See, *Day v. City of Beatrice*, 169 Neb. 858, 101 N.W.2d 481 (1960); *Best, supra; State, ex rel. Nebraska B. & I. Co., v. Board of Commissioners*, 105 Neb. 570, 181 N.W. 530 (1921).

*Rath v. City of Sutton*, 267 Neb. 265, 284-85 (2004) (emphasis added).

This case falls squarely under the *Rath* analysis. DAS is a public body which exercises official discretion when awarding competitive bid contracts in excess of fifty thousand dollars pursuant to Neb. Rev. Stat. § 73-504. The evidence in the record establishes DAS, in exercising its judgment, acted in good faith and upon honest convictions based upon the facts before it; and acted in the best interests of DHHS and Nebraska Medicaid recipients. The evidence establishes the decision to rescore the Corporate Overview Section was for reasoned and considered good faith judgments and was neither arbitrary nor capricious. Diamond Dec. ¶¶ 11-16; Botelho Dec. ¶¶ 10-17.

A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. *Cent. Platte Nat. Res. Dist. v. City of Fremont*, 250 Neb. 252, 255-56 (1996). A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a decision is apt to change suddenly; it is freakish, whimsical, humorsome. *Id.* Finally, there is no evidence of favoritism, ill will, fraud, or collusion in this record. Consequently, the Court must find evidence of (or at least the allegation of) bad faith for Plaintiffs to prevail. Since Plaintiffs have not identified any bad faith, they are unlikely to succeed.

Moreover, as established comprehensively above, Plaintiffs' various claims that Nebraska procurement laws were violated are meritless. Neb. Rev. Stat. § 73-504 allows for a process approved by the Director of DAS. Here, "all procedures regarding the Heritage Health RFP and the associated grievance processes ***were approved***" by the Director. Diamond Dec. ¶ 9 (emphasis added). Neb. Rev. Stat. § 73-501 is a statement of legislative intent that the bidding process be "standardized, open, and fair." The remedial action after the initial scoring anomaly was taken to ensure the bidding process conformed to this Legislative mandate. To the extent Plaintiffs allege a violation of the procurement statutes generally, they are simply unlikely to succeed.

**D. Plaintiffs' pecuniary and commercial interests are vastly outweighed by the harm Medicaid-dependent Nebraska families would suffer if the State's delivery of Medicaid services was disrupted by a preliminary injunction.**

By addressing the balance of harms at this juncture, State Defendants effectively end their argument largely where it began, given the huge significance this case has for the continuity of the delivery of Medicaid services in this State in the immediate term. The analysis here essentially turns on whether Plaintiffs' commercial interests outweigh the public's interest in stable Medicaid delivery.

In conducting the "balance of harms" analysis required under *Dataphase,* an illusory harm to the movant will not outweigh any actual harm to the non-movant. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1023 (8th Cir. 1992). To determine what must be weighed, courts have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994). The goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994).

State Defendants will not restate their accounting of the disruptive effects a preliminary injunction would have. Suffice it to say, at best such a delay will imperil the timely implementation of carefully planned and much-anticipated integration of Nebraska's now disparate Medicaid services. At worst, in the behavioral health services

realm it could mean the outright interruption in care delivery. In the ultimate calculation, this could possibly mean life or death for individuals dealing with acute behavioral conditions.

Aetna's and Arbor's interests, on the hand, can be measured entirely in dollars. Simply put, that settles the question as to the balance of harms.

## II. PLAINTIFFS MUST GIVE ADEQUATE SECURITY IF A PRELIMINARY INJUNCTION IS ISSUED.

In the unlikely event the Court concludes over the foregoing argument that Plaintiffs have met the high burden for the extraordinary issuance of a preliminary injunction, it must likewise order Plaintiffs to give security—through the posting of a bond or otherwise—adequate to compensate State Defendants for the costs they will incur as a result of a wrongful injunction.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purpose of the bond requirement is to assure the enjoined party that it can readily collect damages it might suffer in the event that the injunctive relief was wrongfully issued. *Groupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 314-15 (1999). The amount of the bond is within the discretion of the district court, *Rathmann,* 889 F.2d at 789, but the bond must be adequate to protect the enjoined party against any harm that might result if the enjoined

party wins at trial. *See Mead Johnson & Co. v. Abbott Lab,* 201 F.3d 883, 888 (7th Cir. 2000), *cert. denied,* 531 U.S. 917 (2000).

As established above, enjoining the implementation of Heritage Health at this juncture will cause significant disruptions to the State and its partners. These could include renegotiating or extending existing contracts on an emergency footing. They could also include rapid and dramatic expansions of internal infrastructure to provide for the capacity to operate certain Medicaid programs on a DHHS-administered fee-for-service basis. Costs for such arrangements, from possible renewed procurement processes to ensuring the continuity of service delivery to Medicaid beneficiaries, are bound to be significant.

Special and intense focus will be necessary to approximate such costs for the purpose of setting an appropriate security amount under Rule 65(c). In the unlikely event the Court does decide to issue a preliminary injunction, State Defendants respectfully request the Court convene a special proceeding and/or order the expedited submission of supplemental briefs and evidence to conduct this inquiry.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' respective motions for a preliminary injunction.

Submitted July 25, 2016.

**NEBRASKA DEPARTMENT OF ADMINISTRATIVE SERVICES, NEBRASKA DEPARTMENT OF**

**HEALTH AND HUMAN SERVICES, BYRON L. DIAMOND, FRANCIS BOTELHO, COURTNEY N. PHILLIPS, CALDER LYNCH, and DOUG PETERSON (Defendant in** *Aetna,* **Case No. 4:16-cv-3094, only), State Defendants.**

By:   DOUGLAS J. PETERSON
      *Attorney General of Nebraska*

By:   *s/David A. Lopez*
      Ryan C. Gilbride, NE #22415
      Ryan S. Post, NE #24714
      David A. Lopez, NE #24947
      Jessica M. Forch, NE #24912
      *Assistant Attorneys General*

      James D. Smith, NE # 15476
      *Solicitor General*

      OFFICE OF THE ATTORNEY GENERAL
      2115 State Capitol
      Lincoln, Nebraska 68509
      Tel: (402) 471-2682
      Fax: (402) 471-2957
      Ryan.Gilbride@nebraska.gov
      Ryan.Post@nebraska.gov
      Dave.Lopez@nebraska.gov
      Jessica.Forch@nebraska.gov
      James.Smith@nebraska.gov

      Attorneys for State Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2016, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, using the CM/ECF system, causing notice of such filing to be served upon all parties' counsel of record.

By:     *s/David A. Lopez*